## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| Nelson A. Rodriguez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No: |
| v. | ) | |
| | ) | |
| Villa Verona Design, Inc., and Diane C. | ) | **COMPLAINT** |
| Laskoski, | ) | **(JURY TRIAL DEMANDED)** |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Plaintiff, Nelson A. Rodriguez ("NAR"), by and through his undersigned counsel, complaining of the above-named Defendants, Villa Verona, Design Inc., and Diane C. Laskoski, herein, brings this action pursuant to South Carolina law for violations of S.C. Code of Laws § 39-3-10, the South Carolina Unfair Trade Practices Act, Civil Conspiracy and Tortious Interference with Contractual and Prospective Contractual Relations, Breach of Contract, in the alternative Unjust Enrichment, Fraud and/or Constructive Fraud, Fraud in the Inducement, and Restitution.

## JURISDICTION AND VENUE

1.      Plaintiff brings this action, *inter alia*, pursuant to S.C. Code of Laws § 39-5-10 et seq., the South Carolina Unfair Trade Practices Act (S.C. Code § 39-5-10, *et seq.*) and under state law for Civil Conspiracy, Breach of Contract, Fraud in the Inducement. This Court has supplemental jurisdiction over the South Carolina state law claims under 28 U.S.C. §§ 1332(a) as the state law claims arise from a common nucleus of operative facts.

2.      This Court has personal jurisdiction over each Defendant because each Defendant resides and/or does business in South Carolina and/or has substantial, continuous contacts with

1

South Carolina.

3.      Plaintiff is a resident of the Commonwealth of Puerto Rico.

4.      Co-Defendant Villa Verona Design, Inc. ("VV") is a South Carolina Corporation doing business in Greenville County, South Carolina and the Greenville Federal District Court of South Carolina and all Defendants have been doing business in South Carolina. Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in this District.

5.      Co-Defendant Diane C. Laskoski is of legal age and a resident of Greenville County, South Carolina.

## THE PARTIES

6.      Plaintiff, Nelson A. Rodriguez, is a resident of the Commonwealth of Puerto Rico and is the Owner of real property in Greenville County, South Carolina known as Lot 76, the Cliffs at Glassy (Greenville County TMS# 0645.07-01-036.00) having an address of 56 Raven Rd. Landrum, SC 29356 (the "Property").

7.      Upon information and belief, Co-Defendant Villa Verona Design, Inc., is a South Carolina Corporation doing business in Greenville County, having its principal place of business located at 3598 Hwy 11, Ste. 106 Travelers Rest, South Carolina, which is an address shared with FCH.

8.      Upon information and belief, Co-Defendant Diane C. Laskoski, resides at The Cliffs at Mountain Park, Marietta, South Carolina. She is the President and Senior Designer of Villa Verona, and the person directly dealing with Plaintiff at all times and in all matters relevant to the case.

## BACKGROUND

2

On or about January 11, 2022, Plaintiff entered into a contract with Fairview Custom Homes, LLC ("FCH") to construct the Plaintiff's residence at 56 Raven Dr. Landrum SC; Lot 76, the Cliffs at Glassy (Greenville County TMS# 0645.07-01-036.00). Pursuant to the contract (referred to as the "Original Construction Contract" or "OCC") construction would be completed within fourteen (14) months after "Ground Breaking". The total estimated cost of the project was One Million Six Hundred Thousand ($1,600,000.00). Ground Breaking occurred during the last week of March 2023, thus bringing delivery date to the first week of June 2024, in accordance to the Original Construction Contract. (See, "**Exhibit A**"; "Original Construction Contract"). As time passed and change orders were incorporated with Owner's approval, it became evident that the agreed upon delivery date would not be met. FCH recommended to Plaintiff the hiring of a VV to take care of the interior design part of the project, over another reputable interior design firm that Plaintiff had engaged for a limited purpose and from whom he had received a proposal that he was seriously considering to take charge of the entire project. Plaintiff trusted FCH and met Co-Defendant Laskoski, president of Villa Verona Design, Inc., to talk about the project and her potential engagement, which ended up occurring.

Plaintiff and FCH amended the Original Construction Contract and on July 26, 2024 signed an Addendum. (See, "**Exhibit B**"; the "Addendum to the Original Construction Contract" or "Addendum").  In the Addendum, the parties acknowledged June 2024 as the delivery month under the Original Construction Contract and agreed to an extension, establishing January 31, 2025, as the new delivery date. Additionally, and relevant to the Defendants, the Addendum provided the following:

> "FIRST – Payment of ID Services. Contractor will be responsible for payment of the Project Design Fee as defined in the Client Contract with Villa Verona Design, Inc. dated

3

July 25, 2024 for base scope in the amount of $57,570 of the Interior Designer (ID) Villa Verona/Diane Laskoski so as to have this ID fully engaged in the Project, timely respond to Project Manager of the Project, and avoid further delays. Contractor will not bill Owner any amount related to the ID services invoiced and to be paid under this Addendum.

SECOND – Contract with ID. Owner will establish a direct client contractual relationship with Villa Verona/Diane Laskoski, subject to terms that are reasonable and appropriate until completion and delivery of the Project. Owner shall provide such contract to the Contractor for review and comment prior to execution. The contract between Owner and the ID will state that invoices will be submitted by Villa Verona/Diane Laskoski directly to Contractor. Contractor will honor full payment to the ID for its services due under the contract entered into between Owner and Villa Verona/Diane Laskoski.

THIRD – Adjusted Compensation. All costs associated to all interior finishes of the Project installed by a third party which are not guaranteed by Contractor, will not be part of the Contractor's compensation formula ("Builder's Fee"). All other cost items contained in Exhibit C of the Contract above the total construction cost of $1,643,120.77 will be subject to an adjusted Builder's Fee of fourteen percent (14%) of compensation costs associated with interior finishes of the project and any fees paid to Villa Verona/Diane Laskoski."

[…]

FIFTH – Amendment. This Addendum will amend the [Original Construction] Contract in all terms that are inconsistent with the term[s] stated herein."

After many issues with FCH's failures to comply with the terms of the Addendum, poor control measures, poor management and coordination (with many arbitrary and unexplained postponements on activities that had been scheduled to take place), lack of transparency in the dealings pertaining the project, including billing practices and project interruptions, and after having given to FCH many opportunities beyond the Addendum's January 2025 delivery date, as of October 2025 it became apparent that FCH would be nowhere close to substantial completion to deliver the house anywhere near the original time frame. FCH stopped working on the house and so did VV. The business relationship between Plaintiff and FCH came to an end sometime in

the last quarter of 2025.

According to information provided by FCH, the cost of the project almost tripled. A spreadsheet dated November 13, 2025, generated by FCH, shows that Plaintiff has paid the general contractor the amount of $4,459,768.36, including undue overcharged fees.

## STATEMENT OF FACTS

1. All relevant statements of the Background are incorporated herein.

2. On or about July 25, 2024, (contemporaneously to the signing of the Addendum) Plaintiff entered into an interior design services agreement with VV. This interior design contract (also referred as the "Final VV Contract") established a direct client-contractor relationship between the two parties and replaced a previous similar agreement dated February 27, 2024, between FCH (Chris Hamblen) and VV (Diane Laskoski) (See, "**Exhibit C**", the "Initial VV Contract" dated February 27, 2024; and "**Exhibit D**", the "Final VV Contract" dated July 25, 2024). These two contracts were prepared by VV and were very similar in scope and content. Both, defined the parameters of the relationship between Plaintiff and Co-Defendants, especially as it concerned compensation to which VV would be entitled.

3. The Initial VV Contract - signed by Chris Hamblen, on behalf of FCH, and Co-Defendant Laskoski, on behalf of VV - intended to have Plaintiff as its third-party beneficiary. It established a total compensation for VV in the form of a fix fee of $22,750.00 and covered the same scope of work as the Final VV Contract.

4. As it became evident to Plaintiff that the Initial Contract was insufficient to cover the needs of interior design services for the project, the parties entered into the Final VV Contract. This separate contract provided for additional compensation to be paid to VV by FCH, based on a retainer fee schedule totaling $57,570.00 and payment at an hourly rate of $175.00 for additional

services beyond the scope of work defined in the agreement. It also provided that all items purchased through VV would receive a 35% off its Manufacturer's Suggested Retail Price ("MSRP"), and that "[a]ll orders will require a 50% deposit upon the placement of the order by Owner, 40% due upon receipt of goods by Warehouse, and 10% due upon installation." No other or additional economic terms were agreed by and between the parties.

5.    The two contracts signed by Co-Defendant, Laskoski, committed "to complete all aspects of [the] design project in a professional and timely manner" […] within all agreed upon terms and conditions".

6.  The Final VV Contract had a provision that acknowledged the existence of the previous contract between VV and FCH in the amount of $22,750.00 for which all services contracted had been fully rendered at the time. It also stated that "[t]he present contract entered into between Villa Verona Design and Owner is intended to retain the needed services to fully complete the project and is intended to cover the entire house." All interior design fees stated under both the Initial VV Contract and the Final VV Contract were supposed to be paid to VV directly by FCH, at no cost to Plaintiff.

7.  Co-Defendant, Laskoski, had knowledge of the terms of the Addendum signed by FCH and Plaintiff which impacted her duties and obligations towards Plaintiff. She was informed by Plaintiff several times, orally and in writing.

8.  The parties engaged in a course of dealing wherein VV was presenting proposals to Plaintiff for his consideration on interior design modifications, finishes, tile selection, lighting fixtures, hardware and goods to be purchased for the house, including custom made cabinetries, vanities, shelves, etc., for different areas of the house.  For those design proposals and selections that received Plaintiff's approval, VV would present a general invoice. In most of the cases, VV

6

would forward such invoices to FCH for their submission to Plaintiff for payment, and Plaintiff paid for such items. Throughout this process, Defendants' actions and/or representations towards Plaintiff were materially false or misleading.

9.  As the project started to significantly exceed the total estimated cost pursuant to the Original Construction Contract of One Million Six Hundred Thousand ($1,600,000.00) and giving signs of being lethargically slow and out of control, Plaintiff began questioning the contents of the invoices, identifying errors and requesting corrections, asking for explanations for the high quotes presented and for the submission of incomplete information to back up the general invoices, requesting reviews, asking for official back up information on purchases made and orders placed to ensure compliance with the terms of the contract, among other things. Plaintiff made Co-Defendant, Laskoski, aware of the irregularities found in the invoices that resulted in potential undue overcharges. VV reacted by often shunning Plaintiff's request, at times claiming that the information Plaintiff was asking for was proprietary and could be kept from Plaintiff's knowledge because of that.

10.  FCH complained to Owner that VV was not responding in a timely manner and thus causing schedule delays.

11.  Upon information and belief, VV overbilled Plaintiff by adding unauthorized fees to the invoices submitted to Plaintiff, directly and through FCH, inflating the cost of goods ordered and/or purchased for Plaintiff's house, with the intention of defrauding Plaintiff and in contravention with the terms of the contracts that governed the economic terms between the parties.

12.  VV invoiced Plaintiff a total of approximately Nine Hundred Thirty-Five Thousand and Six Hundred Eighty-Four Dollars and Thirty-Nine Cents ($935,684.39) for the category of

items listed in the table below, while at the same time was evasive on providing Plaintiff with complete, official and reliable information on items purchased, manufacturers' information, real cost and prices.

13.  Upon information and belief, VV overbilled Plaintiff and/or caused Plaintiff to be overbilled for unauthorized fees in the amount of approximately Three Hundred Twenty-Eight Thousand and One Hundred Seventy-Four Dollars and Seventy-Seven Cents ($328,174.77)

| Category/Description | Amount Invoiced by VV | Amount Paid by Plaintiff | Calculated Approx. Overcharge |
|---|---|---|---|
| 1.<br>Decorative Lighting Fixtures | $69,594.03<br><br>(Inv. No. V8254, V8254A, V8254B, V8311, V8311A) | $53,230.21 | $24,357.91 |
| 2.<br>Tiles | $122,987.56<br><br>(Inv. No. V8256 and V8256A) | $123,173.18 | $43,045.65 |
| 3.<br>Cabinetry, Vanities & Millwork (Porcelanosa and Family Woodworking LLC, including installation) | $378,995.58<br><br>(Inv. No. V8266, V8278) | $378,995.58 | $132,648.45 |
| 4.<br>Porcelanosa Wood Veneers and Decorative Wooden Ceiling Piece for over the Kitchen Island | $93,840.74<br><br>(Inv. No. V8278) | $93,840.07 | $32,844.26 |
| 5.<br>Cabinets of the Carolinas Cabinetry and Millwork (including installation), for five areas/jobs. | $176,520.74<br><br>(Inv. No. V8299 Corrected, V8328) | $176,550.74 | $65,960.74 |
| 6.<br>Onyx (Star Granite Interiors) | $27,180.07<br><br>(Inv. No. V8313) | $27,180.07 | $6,019.78 |

| 7.<br>Hardware | $66,565.67<br><br>(Inv. No. V8284, V8323) | $63,735.47 | $23,297.98 |
|---|---|---|---|
| **Total** | **$935,684.39** | **$916,705.32** | **$328,174.77** |

14. VV induced Plaintiff into paying for invoiced amounts in full, in a manner that was detrimental to Plaintiff and in violation of VV's commitments under the contract.

15. Regarding all Decorative Lighting Fixtures purchased for which Plaintiff has paid approximately $53,230.21 (item 1 of the Table), VV refused to release and deliver the goods that, upon information and belief, are under her possession. Co-Defendant, Laskoski, requested Plaintiff as a condition to release these goods, to be paid in full an additional sum of $16,363.82. This request is in clear contravention to the contract, as the agreement provides that the last 10% (which in the case of this item equals $6,959.40) is "due upon installation", which cannot occur until after the goods are released and delivered.

Also, this is an item, upon information and belief, for which there has been an overcharge by VV of $24,357.91. Co-Defendant, Laskoski, has refused to provide the information that would allow Plaintiff to determine compliance with the purchase provision of the contract and the 35% off the MSRP. Thus, Co-Defendant, Laskoski, continues to hold the paid for goods hostage to her undue requests for additional payments.

16. Regarding the item of Tiles (item 2 of the Table), VV received payment for 100% of the total amount Co-Defendant, Laskoski, invoiced for the entire purchase ($122,987.56), which is at least $12,298.76 in excess of what the contract allowed (due to the 10% due upon installation provision). Installation had barely begun at the moment of the project stoppage. Therefore, VV

was not entitled to invoice or receive the $12,298.76. Also, this is an item on which, upon information and belief, there was an overbilling by VV of $43,045.65. Co-Defendant, Laskoski, has refused to provide the information that would allow Plaintiff to determine compliance with the purchase provision of the contract and the 35% off the MSRP with respect to this item.

17. Regarding a large shipment that came from Spain on Porcelanosa branded products that Plaintiff had selected and purchased for the kitchen, the pantry, the master bathroom, the office and the great room (items 3 and 4 of the Table), Plaintiff asked VV for the bill of lading, freight bills and manufacturer's invoices to ensure he was receiving the contracted 35% discount on MSRP, and to preserve data in the event items had to be repaired or replaced in the future.  Co-Defendant, Laskoski, refused to provide any of the aforementioned documentation.

Co-Defendant, Laskoski, deliberately prevented Plaintiff from obtaining the information from Porcelanosa USA headquarters on the products Owner had purchased for his own home, by registering VV and not Plaintiff as the "Client" who had made the purchase. This registration was done without the authorization of Plaintiff and in contravention to Owner's intent and wishes.

18. For items referred in 3 and 4 of the Table (cabinetries, vanities, millwork, decorative wood veneers and a ceiling piece), VV invoiced the total amount of $472,836.32 and enticed Plaintiff into paying this amount in full. This is in clear contravention to the contract, as the agreement provides that the last 10% (which in the case of these items equals $47,283.63) is "due upon installation". In addition, related Invoice V8266 prepared by Co-Defendant, Laskoski, and which was paid in full by Plaintiff, had a charge for $43,990.00 for "Installation of all cabinetry". Despite being paid in full, VV abandoned the installation of the purchased goods and did not finish the job.

19. Regarding the items contracted to Cabinets of the Carolinas (item 5 of the Table), VV

10

added to the invoices presented to Plaintiff, unauthorized fees in the amount of $65,960.74. VV enticed Plaintiff into paying the full overbilled amount of $176,520.74 (including installation), despite the contractual provision stating that the last 10% was due upon installation. In the case of the jobs contracted to Cabinets of the Carolinas, zero installation has occurred. Upon information and belief, Co-Defendant, Laskoski, did not forward to Cabinets of the Carolinas the amount to cover for the contracted jobs for a total price of $110,560.00. Upon information and belief, Cabinets of the Carolinas was paid only $27,000, thus, Co-Defendants wrongfully kept $149,520.74 that was supposed to be destined to complete and install this item. These actions by Defendants have caused stagnation into the project.

20. Regarding the Onyx material (item 6 of the Table), upon information and belief VV overbilled Plaintiff the amount of $6,019.78, by adding an unauthorized fee. Co-Defendant, Laskoski, requested Plaintiff to make full payment of Invoice V8313 for $27,180.07 as a condition for placing the order with the supplier. The payment made by Plaintiff included "All fabrication and installation". Plaintiff, enticed by Co-Defendants misrepresentations and unaware of the addition of the unauthorized fees, paid the full amount requested. At one point, VV admitted to Plaintiff that she had added an unauthorized fee on this item, in the form of a markup.

21. Regarding the Hardware for which Plaintiff has paid $63,735.47 (item 7 of the Table), Defendants invoiced $66,565.67. No installation of hardware has occurred, or if some has occurred, it was not significant. VV made requests for payments in clear contravention to the contract, as the agreement provides that the last 10% (which in the case of this item equals $6,656. 57) is "due upon installation". Also, this is an item on which, upon information and belief, there has been an overcharge by VV of $24,357.91. Co-Defendant, Laskoski, has refused to provide the information that would allow Plaintiff to determine compliance with the purchase provision of the

contract and the 35% off the MSRP.

23. On September 3, 2025, Co-Defendant, Laskoski, assured Plaintiff, via email, that she would complete the project when she stated "I will complete my contractual commitment without the requested selections or any further procurement." However, Co-Defendant, Laskoski, continued with her refusal to provide information to Plaintiff and opted to cease working on the project, despite having received thousands of dollars for her services, some of which she was not entitled to receive.

24. On December 17, 2025, FCH informed Plaintiff that VV cabinetry, vanities and millwork related work (items 3, 4 and 5 of the table) is Forty Percent (40%) complete. However, for these three items VV induced payment of One Hundred Percent (100%) of the amounts invoiced by Co-Defendant Laskoski.

25. As the business relationship between Plaintiff and FCH came to an end sometime in the last quarter of 2025, and Plaintiff began transitioning to a replacement builder and a new interior design firm, Co-Defendants, VV, and particularly Co-Defendant, Laskoski, have refused to deliver products as required by the Final VV Contract, so that the new team retained by Plaintiff is able to resume and complete the project. VV refuses to provide any sort of accounting or any meaningful inventory of items to prove that such items are actually in a warehouse. Also, despite Plaintiff's extrajudicial efforts, Co-Defendants continue on their bad faith refusal to provide receipts and other detailed information on the purchases made for Plaintiff's home, while brazenly requesting payments that are unwarranted. VV has demanded payment in full for items while the Final VV Contract calls for design fee payment to be made by FCH and a final 10% of all orders to be paid after delivery and installation into Plaintiff's residence.

26. Upon information and belief, Co-Defendants have engaged in conduct that has

materially interfered with and substantially delayed Plaintiff's ability to move the residential construction project toward completion, including Plaintiff's efforts to proceed with a replacement interior design firm and a replacement general contractor.

27. Defendants' acts and omissions have been a direct and proximate cause of Plaintiff's inability to complete his residence, resulting in continuing and irreparable harm. Plaintiff has been deprived of the use and enjoyment of his home and is unable to occupy the property with his family as intended.

28. As a further direct result of Defendants' conduct, Plaintiff is unable to utilize and enjoy the facilities, programs, and services associated with his membership at The Cliffs Club – including the golf course, wellness center, and scheduled activities – despite being obligated to pay monthly dues of close to $1,000.00.

29. Defendants have acted in a manner that shows neglect and reckless disregard of Plaintiff's repeated concerns and the ongoing loss of irreplaceable time during which Plaintiff remains unable to enjoy his unfinished residence.

30. This deprivation is particularly significant in light of Plaintiff's health conditions and the limited period during which he may reasonably expect to benefit from and enjoy the completed home.

## FOR A FIRST CAUSE OF ACTION

### (Breach of Contract-Breach of the Covenant of Good Faith and Fair Dealing)

26.     Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

27.     Plaintiff entered into the Final VV Contract with VV wherein VV agreed to provide materials and services pursuant to the Final VV Contract and NAR agreed to pay for such services

and products.

28.     The Final VV Contract provided that, "[a]ll items purchased from Villa Verona Design will be sold to Owner at the cost of the respective item(s) at 35% off MSRP."  The VV Final Contract also provided, "[a]ll orders will require a 50% deposit upon the placement of the order by Owner, 40% due upon receipt of goods by Warehouse and 10% due upon installation."

29.     Implied in the Final VV Contract was the understanding that there would be transparency between the parties in billing, delivery confirmations regarding products in a warehouse, and proof of the application of the 35% MSRP discount.  These contractual duties are also a part of the implied covenant of good faith and fair dealing which is inherent in every contract.

30.     It was also known and understood between the parties that FCH required VV to be "fully engaged" in the Project as it was "critical for [the Project's] adequate and timely completion." (See, **Exhibit B,** p.1, ¶6; Addendum to Construction Contract). The Final VV Contract further stated that "The present contract entered into between Villa Verona Design and Owner is intended to retain the needed services to fully complete the project and is intended to cover the entire house." (See, **Exhibit D,** p. 5, ¶3; Final VV Contract)

31.     It was further known and understood that FCH would review the Final VV Contract to ensure it was suitable to FCH and that the Final VV Contract "would state that invoices would be submitted by VV/Diane Laskoski directly to [FCH]" and that "[FCH] would honor full payment to [VV] for its services due under the contract entered into between Owner and Villa Verona/Diane Laskoski."  The Addendum to the Construction Contract also stated that FCH would pay VV's design fee separate and apart from the costs of any other materials or services.

32.     Defendant VV has breached its contract with NAR, the implied terms of the contract and the covenant of good faith and fair dealing in the following particulars to wit:

14

(a)    Failing to deliver materials as they arrived at a warehouse or her own store location;

(b)    Failing to disclose material terms regarding prices and costs of goods ordered and/or purchased for Plaintiff's project, and misleading Plaintiff regarding the true cost of goods and services contracted.

(c)    Knowingly billing Plaintiff for undisclosed and/or concealed fees not authorized by the Final VV Contract.

(d)    Requesting NAR to pay interior design services fees prior to delivering items;

(e)    Requesting NAR to pay interior design services fees prior to completing installation;

(f)    Failing to provide bills of lading, shipping invoices, information regarding a 35% MSRP discount;

(g)    Failing to provide manufacturing information;

(h)    Demanding undue payment in advance from NAR;

(i)    Failing to provide information regarding installation of products making it impossible for NAR to avoid undue "builder fees" from FCH or otherwise be informed regarding warranty information.

33.    As a result of VV's breach of contract, NAR is entitled to actual damages to be determined by the trier of fact along with the disclosure of the aforementioned information.

## FOR A SECOND CAUSE OF ACTION

**(South Carolina Unfair Trade Practices- SC Code of Laws § 39-5-10 et seq.)**

34.    Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

35.    Upon information and belief, Defendants engaged in unfair or deceptive practices

15

in the following particulars to wit:

(a)    By imposing billing schemes designed to overbill Plaintiff with undisclosed and/or concealed fees that were not agreed to nor authorized by Plaintiff;

(b)    By inducing payment from Plaintiff of unauthorized and/or concealed and/or undisclosed fees included in VV invoiced amounts, while additionally and separately collecting fees from FCH for the sums agreed in the Final VV Contract.

(c)    By imposing billing schemes designed to deceive Plaintiff and hide kickbacks or other favorable incentives to FCH;

(d)    By failing to disclose to Plaintiff material terms regarding prices and cost of goods ordered and/or purchased for Plaintiff's project, and misleading him regarding the true cost of goods and services contracted.

(e)    By making false representations to Plaintiff regarding costs.

(f)    By charging and inducing payment from Plaintiff for services and/or jobs not performed;

(g)    By charging and inducing payment from Plaintiff for installments not completed;

(h)    By charging and inducing payment from Plaintiff for goods that have not been tendered or delivered;

(i)    By concealing conflicts of interest and unauthorized fee padding to benefit the builder who recommended Defendants;

(j)    By coordinating billing or fee padding schemes with the builder that contravened the agreements entered into by Plaintiff with the Defendants and with the builder;

(k)    By stonewalling the requests for information made by Plaintiff pertaining the purchases made for the project, in coordination with the builder;

16

(l)     By representing Plaintiff would receive 35% off of MSRP on the items it purchased when it in fact knew or represented that products were "custom products" that did not qualify for any sort of discount;

(m)     By repeatedly submitting misleading and/or deceptive invoices to Plaintiff;

(n)     By representing compliance with contract terms while knowingly billing contrary to those terms;

(o)     By engaging behavior that is offensive to public policy, immoral, unethical and oppressive in that Defendants have failed to provide products and information for the completion of the NAR residence in an attempt to hold Plaintiff hostage until unrightful payment is received;

(p)     By Defendants' tortious interference with contractual and/or prospective contractual relations, which is *per se* evidence of a violation of the SCUTPA.

(q)     By Defendants' self-serving justification of the modus operandi displayed with Plaintiff under the guise that it is a "standard practice" in their industry and/or line of business.

36.     Defendants' conduct was willful and/or knowing.

37.     Plaintiff has suffered actual and ascertainable damages as a result of Defendants' use of unlawful trade practices.

38.     The unlawful trade practices of Defendants have or will have an adverse impact on public interest as:

(a)     The conduct is part of Defendants' regular business practice;

(b)     The same deceptive billing practices could be used with other clients;

(c)     The practice, if not rooted out, promotes the spread of unethical, mendacious and

17

dishonest behavior from service providers in the construction related business towards consumers in general.

(d)    The conduct has the potential of repetition, likely to recur, and of affecting other customers, beyond the contractual controversy between the parties.

39.    Upon information and belief, Defendant has acted willfully and knowingly in the violation of SC Code of Laws § 39-5-20 in that Defendants either knew or should have known that its conduct was violative of the Act.

40.    Further, Defendants' acts, representations, omissions and practices are material, unfair, have potential to deceive and mislead consumers and are in fact deceptive and misleading, offensive to public policy, immoral, unethical and oppressive, unscrupulous, likely cause and in fact cause substantial injury to consumers which is not possibly avoidable by consumers and not outweighed by countervailing benefits to consumers.

41.    As a result, Defendants are liable to Plaintiff for actual damages in an amount to be determined by the trier of fact, treble damages and the attorney's fees and costs associated with this action.

## FOR A THIRD CAUSE OF ACTION

**(Fraud and/or Constructive Fraud - Fraudulent Inducement to Enter into Contract)**

42.    Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

43.    Defendant has both a legal and equitable duty to carry on its relationship with Plaintiff in a fair and honest way.

44.    Defendants represented to Plaintiff that certain interior design services, work, goods, and purchase orders had been placed in accordance with Plaintiff instructions and the terms

18

agreed or completed, or would be completed, when in fact they had not.

45.     Defendants also represented, expressly and impliedly, that amounts invoiced to Plaintiff complied with the terms agreed to by the parties.

46.     These representations were material, false, and known by Defendants to be false at the time they were made, or were made recklessly without regard for their truth.

47.     Defendants made these representations with the intent that Plaintiff rely upon them in approving invoices and making payments.

48.     Plaintiff reasonably relied on Defendant's representations and paid invoices believing the charges were accurate, authorized, and reflective of work actually performed and/or high-end goods purchased.

49.     As a result of Defendants' misrepresentations and omissions, Plaintiff paid Defendant for work not performed and paid amounts in excess of those permitted under the parties' agreement.

50.     Defendants made a representation to Plaintiff that Plaintiff would receive a thirty-five percent (35%) discount on interior construction/building items procured through VV.

51.     Defendant never gave Plaintiff a discount on any item procured pursuant to the Final VV Contract and despite demands for proof of such discounts, VV has ignored Plaintiff's requests.

52.     Defendants' representations were false and material to Plaintiff's decision to enter into that contract with Defendant.

53.     Defendants made such representations either with outright knowledge of the falsities of such representations or reckless disregard to the truth or falsity of such statements.

54.     Defendants intended that such representations would induce the Plaintiff into

19

entering the contract with VV and the Plaintiff was ignorant to the falsities and intentions of VV's representations, assuming Plaintiff would benefit from the parties' agreement.

55.     Plaintiff had the right to rely on the truth of Defendants' representations and, in fact, had a right to rely on such representations.

56.     Defendants' false and fraudulent representations are the proximate cause of the Plaintiff's injuries and damages.

57.     Defendants, in its deceptive and dishonest billing practices and representations to Plaintiff, has engaged in actionable fraud and/or constructive fraud.

58.     Defendants have been unjustly enriched by its fraudulent and deceptive conduct.

59.     Plaintiff suffered damages as a direct and proximate result of Defendants' fraudulent acts and omissions.

60.     As a result of such fraud and/or constructive fraud Defendants are liable to Plaintiff for the actual, special and consequential damages including the attorney's fees and costs of this action.

## <u>FOR A FOURTH CAUSE OF ACTION</u>

### (Unjust Enrichment)

61.     Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

62.     Plaintiff conferred a direct and substantial benefit upon Defendants by paying Defendants significant sums of money for interior design services, materials, and related goods and services in connection with Plaintiff's property.

63.     Defendants knowingly accepted and retained these payments.

64.     Defendants received payments for interior design services, labor, and work that

Defendant failed to perform, failed to complete, or performed only partially, including work represented to Plaintiff as completed when it was not.

65.     Defendants did not provide the services, labor, or deliverables for which Plaintiff paid, yet retained the corresponding payments.

66.     Separately, Defendants overbilled Plaintiff for goods and services by charging amounts that exceeded the compensation, markups, and limitations agreed to by the parties, including charges not authorized, not disclosed, and not authorized under the parties' agreement.

67.     Defendants' overbilling included charging Plaintiff amounts that were not commensurate with the reasonable value of the goods or services actually provided.

68.     As a result, Defendants received and retained payments in excess of the value of any benefit conferred upon Plaintiff.

69.     Defendants were unjustly enriched by retaining payments for work not performed and/or undelivered goods, and by retaining overpayments obtained through improper billing practices.

70.     Defendants' retention of these funds is inequitable and unjust because Plaintiff did not receive the benefit for which it paid, and Defendants did not earn the compensation retained.

71.     Equity and good conscience require Defendants to disgorge and return all monies retained for unperformed work and undelivered goods, and all amounts overbilled to Plaintiff.

72.     Plaintiff pleads this claim in the alternative to its breach of contract claims, and seeks restitution to the extent Defendants received benefits not governed by, or obtained in violation of, the parties' agreement.

73.     Plaintiff has suffered damages in an amount to be determined at trial as a direct and proximate result of Defendant's unjust enrichment.

## FOR A FIFTH CAUSE OF ACTION

### (Restitution – Overbilling Only – Equitable Relief)

74.     Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

75.     Defendants charged and collected payments from Plaintiff for goods and services in amounts exceeding those permitted under the parties' agreement, including undisclosed or unauthorized markups and charges.

76.     Defendant retained these overpayments despite knowing that they were not authorized, earned, or reflective of the reasonable value of goods or services provided.

77.     Defendants have been unjustly enriched by retaining these overpayments.

78.     Plaintiff lacks an adequate remedy at law for the recovery of all overbilled amounts.

79.     Equity requires Defendant to make restitution and return all sums collected through overbilling, regardless of whether a contract governs other aspects of the parties' relationship.

80.     Plaintiff is entitled to restitution of all overbilled amounts, together with interest.

## FOR A SIXTH CAUSE OF ACTION

### (Civil Conspiracy-The General Rule)

81.     Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

82.     Upon information and belief, Defendant has entered into a continuing agreement, understanding, combination and/or conspiracy through the implementation, maintenance and development of a scheme of conduct that is offensive to public policy, immoral and unethical in

22

the construction industry wherein Defendant and FCH have combined to excrete undue funds from Plaintiff through various forms of trickery and deceit. VV and FCH have committed fraud, mail fraud, and wire fraud as a means to excrete undue funds from Plaintiff.

83.     Defendant's agreement, understanding, combination and/or conspiracy to overbill and hide wrongful payments to FCH and VV have caused Plaintiff actual damages in the form of undue overpayment and special damages by way of attorney's fees and costs to recover such overpayments.

84.     As a result of VV's Civil Conspiracy, VV is liable to Plaintiff for the actual, punitive and special damages as to be determined by the trier of fact.

## FOR A SEVENTH CAUSE OF ACTION

### (Civil Conspiracy—Exception to the General Rule; Force of Numbers)

85.     Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

86.     To the extent that VV's conduct may not have been actionable through VV directly, Plaintiff alleges herein that the combined actions of VV and FCH created a unique position to form a particular power of coercion over Plaintiff and exceptional circumstances, and that combination of the two tortfeasors created a situation wherein Plaintiff's construction project was shut down and held hostage in a concerted effort to induce Plaintiff into continuing the contracts with both FCH and VV and pay undue sums of money to complete the project.

87.     As a result of VV's Civil Conspiracy, VV is liable to Plaintiff for the actual, punitive and special damages as to be determined by the trier of fact.

## FOR AN EIGHTH CAUSE OF ACTION

### (Action to Pierce the Corporate Veil)

23

88.     Plaintiff herein restates and re-alleges the prior allegations of this Complaint as if contained herein verbatim.

89.     Villa Verona Design, Inc. is corporation organized and existing under the laws of the State of South Carolina.

90.     Diane C. Laskoski is the sole shareholder or the dominant and controlling shareholder of VV.

91.     Upon information and belief, Laskoski failed to observe corporate formalities in that VV is undercapitalized, VV failed to observe traditional corporate formalities and operating procedures, VV pays no dividends, VV is practically insolvent, the dominant shareholders/members siphon funds from VV , any officers or directors are non-functioning, there is an absence of corporate records and the VV is merely a façade for the shareholders' operations.

92.     If the corporate entities were not disregarded by the court, Plaintiff would suffer injustice and fundamental unfairness by the inability of VV to pay its debts and Diane C. Laskoski should not be allowed to hide from the normal consequences of carefree entrepreneuring through her corporate shell.

93.     For the foregoing reasons, CW prays this court find cause to pierce the corporate veils and impose personal liability of BIGLER and MOATES.


## DEMAND FOR JURY TRIAL

94.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury for all issues so triable in this case.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays the court find as follows:

1.      That Defendants have breached the express and implied terms of the Final VV Contract and an award of actual damages to be determined by the trier of fact, including the recovery of amounts paid for undisclosed and/or concealed fees, and amounts paid for goods not delivered and services not performed;

2.      That Defendants have breached the Final VV Contract in the breach of the covenant of good faith and fair dealing inherent in every contract along with an award of actual damages to be determined by the trier of fact;

3.      A determination that Defendant acted in a willingfully and knowingly violation of the South Carolina Unfair Trade Practices Act, S.C. Code of Laws § 39-5-20, along with an award of actual damages, treble damages and the attorney's fees and costs of this action;

4.      For a determination that VV fraudulently induced Plaintiff into entering the Final VV Contract along with actual damages to be determined by the trier of fact;

5.      Order Defendant to disgorge and return all monies paid for unperformed work and all overbilled amounts;

6.      For a determination that Defendants are liable for Civil Conspiracy along with an award of special damages in the form of the attorney's fees and costs associated with this action, actual damages, and punitive damages;

7.      Award restitution in an amount proven at trial;

8.      A determination the corporate shield be pierced, the VV entity shall be disregarded and an imposition of personal liability upon Diane C. Laskoski or any other offending officer or shareholder which may be identified at a later date and made a party to this suit;

9.      For an award of pre-judgment and post-judgment interest as allowed by law;

10.     A trial by jury; and

25

11.     Award costs and such other relief as the Court deems just and proper.

Respectfully submitted,

WENDELL L. HAWKINS, PA


By: s/ Wendell L. Hawkins
Wendell L. Hawkins, Esq. (Fed Id. 7771)
9 Buena Vista Way, Ste. B
Greenville, South Carolina 29615
(864) 848-9370 (Ph) (864) 243-8137 (Fax)
wlh@wlhawkinslawfirm.com
Attorneys for Plaintiff

Greenville, South Carolina
February 26, 2026